UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| WARREN and MARYANN ANDREWS, | : | Hon. Joseph H. Rodriguez |
| Plaintiffs, | : | Civil Action No. 14-5147 |
| v. | : | OPINION |
| MERCHANTS MUTUAL INS. CO., | : | |
| Defendant. | : | |

This matter is before the Court on Defendant Merchants Mutual Insurance Company's motion for summary judgment. [Doc. 21.] The Court heard oral argument on the motion on July 7, 2016, and the record of that proceeding is incorporated here. For the reasons outlined below, the motion will be granted.

Background

This is a homeowners insurance coverage / bad faith dispute that results from the effects of two different storms, the latter of which was Hurricane Sandy.[1] During the relevant time period, Defendant Merchants Mutual Insurance Company ("Merchants"), insured the one-story residence of Plaintiffs Warren and MaryAnn Andrews (husband and wife), located in Linwood, New Jersey.

---

[1] The Complaint asserts two claims: breach of the insurance contract and bad faith delay in the processing of insurance benefits. This Court's subject matter jurisdiction rests on diversity of citizenship, 28 U.S.C. § 1332.

1

Overnight on June 29, 2012 and into June 30, 2012, areas in Southern New Jersey experienced a "derecho" storm, with winds exceeding 80 miles per hour.  (W. Andrews 1/13/14 Dep. p. 34)[2]

Three or four weeks later, Plaintiffs discovered a water leak in their home.  Water was running down from the ceiling in the master bathroom and in the adjacent wall of the living room.  (M. Andrews 1/14/13 Dep. p. 29; W. Andrews 1/14/13 Dep. p. 27-28)  MaryAnn Andrews testified, "[t]here was [water pouring down] in the master bedroom . . . . There was a lot of moisture and water coming in that room and in the living room all through the house." (M. Andrews 9/25/13 Dep. p. 31)  This discovery led Warren Andrews to inspect the roof, where he found missing and damaged shingles.  (W. Andrews 1/14/13 Dep. p. 28)

On July 30, 2012 Plaintiffs submitted a "Property Loss Notice" to Merchants. (MER0416)

Shortly thereafter, Plaintiffs provided to Merchants an invoice for emergency roof repairs (MER0289), and an estimate for replacing the entire roof. (MER0288) According to Plaintiffs, they concluded that the entire roof should be replaced because the sheathing under the roof shingles had been damaged in the derecho storm. MaryAnn Andrews testified, the emergency repair was intended to be "temporary;" it

---

[2] The National Weather Service defines "derecho" as "a widespread, long-lived wind storm that is associated with a band of rapidly moving showers or thunderstorms. Although a derecho can produce destruction similar to the strength of tornadoes, the damage typically is directed in one direction along a relatively straight swath." http://www.weather.gov/lmk/derecho.  See also, David Giambusso, "Violent Storm that Slammed South Jersey is Known as Derecho," New Jersey Star Ledger Online, June 30, 2012, available at http://www.nj.com/news/index.ssf/2012/06/ violent_storm_that_slammed_sou.html.

was never meant to "withstand a hurricane." (M. Andrews 5/29/13 Dep. p. 18; see also W. Andrews 1/13/14 Dep. p. 34; W. Andrews 8/31/15 Dep. p. 23-24)

On August 21, 2012, Merchants' Independent Adjuster, Tri-State Adjusters, inspected the property. (MER0272-80)  Tri-State advised Merchants that there was, indeed, a leak in the roof, but that replacing the entire roof was "excessive."  (MER0286)

A separate flooring contractor also inspected, on behalf of Merchants, Plaintiffs' newly refinished hardwood floors that were damaged by the leaking water. (MER0411-12)

"[A] day or two before Sandy," Warren Andrews saw extensive mold on his clothes and shoes in the master bath closet. (W. Andrews 1/13/14 Dep. p. 48, 65) Plaintiffs assumed the mold came from the water that leaked in from the roof.  (W. Andrews 1/13/14 Dep. p. 25)

Hurricane Sandy hit New Jersey on October 29-30, 2012.  It is undisputed that the crawlspace of the house flooded.  Subsurface water came up through the ground, resulting in "1-2 feet of standing water" in the crawlspace. (W. Andrews 1/13/14 Dep. p. 84)

Plaintiffs testified that after Sandy, they also observed water coming down from the ceiling in the same area where they previously had the roof leak.  Specifically, MaryAnn Andrews testified, "we got a big bulge of water;" "a big leak over the vanity [in the master bathroom] . . . where it just like crashed down.  The water just came barging down right over the master bath vanity." (M. Andrews 5/29/13 Dep. p. 113-14).  Warren Andrews testified, "we found [water] stains on the ceiling" (W. Andrews 1/14/13 Dep. p. 41-42) and "sheetrock was caving in from water from rain." (W. Andrews 8/31/15 Dep. p. 21)

3

Soon thereafter, Plaintiffs began to suspect that they had a significant mold problem. MaryAnn Andrews testified, "we had mold before [Sandy] but nothing—it wasn't inside the house, growing in the windows and every place that we found, it kind of like exploded when Sandy hit." (W. Andrews 1/13/14 Dep. p. 25)

By check dated November 3, 2012, Merchants paid the Andrews $6,457.06. (MER0472) Merchants' file only reflects that the "check reason" was "damages." (Id.)

On November 12, 2012, Plaintiffs' mold remediation company, Quality Air Care, took samples throughout the house to send out for lab testing. (MER0315-35) While obtaining the samples, Quality Air's employee, Klod Belegu, showed MaryAnn Andrews mold and water stains coming down from the ceiling. (M. Andrews 1/14/13 Dep. p. 72-73)

Quality Air's resulting "MoldView" report indicates that Plaintiffs' house had high levels of cladosporium and aspergillus/penicillium mold, with highest spore concentrations occurring in the crawlspace. (MER0315)

Two weeks later, on November 26, 2012, a second independent adjuster for Merchants inspected Plaintiffs house. (MER0366-76)

Two days later, Merchants' mold remediation specialist, Briggs Associates, performed "fungi investigation and microbial testing" in the house. (MER0379-403) The resulting report also indicated high levels of cladosporium and penicillium, with highest spore concentrations occurring in the crawlspace. (MER0338-62) The report also observed "dark water staining" and "possible mold" "on [the] ceiling joists throughout" the attic. (MER0341)

In a letter dated December 5, 2012 (MER0405), Merchants enclosed a check dated December 6, 2012, payable to the Andrews in the amount of $12,158.06. (MER0473)   The letter explained,

> [t]aking into consideration the payment of $6,457.06 already issued to you on this claim, you will be receiving under separate cover a supplemental payment in the amount of $12,158.06 to conclude the adjustment of this claim. . . . [W]e allowed for the replacement of dimensional shingles on the two rear slopes of the roof, refinishing of the hardwood floors, custom based molding throughout the first floor, insulation, repair of the cabinet and made allowance for three days of additional living expenses while the floors were being refinished.

(MER0408)

However, the letter continued,

> [a]s outlined in the mold report prepared by mold expert Doug Ferry, the elevated interior fungal concentrations arose from the crawl space and not the attic.  Based upon this information we regretfully inform you that the mold remediation subject to a $10,000 limit under the policy of insurance would not be covered.

(Id.)

Merchants' internal records indicate the claim was then closed. (MER0410)

Two weeks later, though, on December 21, 2012, Merchants issued a third check payable to the Andrews in the amount of $10,000.00 (MER0471), which undisputedly represents the full mold sublimit payment available under the policy.

In mid-September 2013, Plaintiffs demolished their house with the intent to rebuild it with all new materials. (M. Andrews 9/25/13 Dep. p. 9)  MaryAnn Andrews testified that she and her husband decided to demolish and rebuild because they concluded that mold remediation would be cost-prohibitive and might not eliminate all of the mold. (M. Andrews 9/25/13 Dep. p. 98-99)

Plaintiffs filed this suit in August 2014.

5

## Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (a).  The Court will enter summary judgment in favor of a movant who shows that it is entitled to judgment as a matter of law, and supports the showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

## Analysis

Breach of Contract Claim

The undisputed record indicates that Merchants paid the policy limit of $10,000.oo for mold damage, and indeed, made two other payments. Plaintiffs' counsel agreed at oral argument that the $10,000.oo payment fulfills Merchants' contractual obligation.

The undisputed record demonstrates that Merchants fully performed under the policy at issue; therefore, summary judgment will be granted to Merchants on the breach of contract claim.

Bad Faith Claim

The specific contours of Plaintiffs' bad faith claim are not entirely clear. At oral argument, Plaintiffs' counsel stated that Plaintiffs are claiming damages above and beyond the policy limits because Merchants delayed the processing of the derecho-related claim. Plaintiffs' brief in opposition to Merchants' summary judgment motion[3] states,

> Plaintiff is prepared to present at trial that the processing of this claim was delayed because [1] the insurer initially put the wrong dates on the paperwork, [2] the insurer initially mistakenly said that the Plaintiff did not have mold coverage when they did, [3] the insurer initially said the policy had lapsed when in fact it had not, [4] and the insurer mistakenly marked the case closed when in fact it was still pending.

(Opposition Brief, p. 3) Plaintiffs cite no record evidence in support of these factual assertions. Contrast Fed. R. Civ. P. 56(c)(1)(A)("A party asserting a fact . . . must support the assertion by citing to particular parts of materials in the record.").

"[A]n insurer acts in bad faith in delaying the processing of a valid claim when (1) the insurer's conduct is unreasonable, and (2) the insurer knows that the conduct is unreasonable or recklessly disregards the fact that the conduct is unreasonable. . . . *Neither negligence nor mistake is sufficient to show bad faith.*" Pickett v. Lloyd's, 131 N.J. 457, 474 (1993) (emphasis added).

The record evidence viewed in the light most favorable to Plaintiffs cannot support inference that Merchants acted in bad faith in processing the claim at issue. Indeed, two of the four pieces of purported evidence Plaintiffs rely upon are-- in Plaintiffs' own words-- merely "mistakes." (Opposition Brief, p.3)

---

[3] Plaintiffs' entire opposition to summary judgment is a four-page letter brief.

Further, with regard to Merchants "initially put[ting] the wrong dates on the paperwork," the Court assumes Plaintiffs are referring to the following notation in Merchants' internal computerized claim file:

> Mrs. Andrews called me [on November 20, 2012] and we had a long discussion and then I spoke with the [insurance] Agent. The date of loss must have been keyed in wrong. We have it as 5/7/12 but the date on the [Notice of Loss] is 7/27/12.

(MER0411) Nothing about this statement-- to which neither Plaintiffs' brief, nor the record, gives any further context-- suggests that the erroneous date was anything other than a mistake. Cf. Pickett, 131 N.J. at 474 (explaining that there is no bad faith "when a claim is lost in the computer."). Moreover, the undisputed record demonstrates that once the error was discovered, it was corrected.

Lastly, with regard to Merchants "initially saying" that Plaintiffs' policy had lapsed, the Court assumes Plaintiffs rely upon the following deposition testimony of MaryAnn Andrews:

> A: You had asked the question who told us that we did not have insurance coverage and that was Debbie Spallone from Merchants, and she was the inside [sic] house adjuster. . . . And at that point is when I e-mailed [our insurance agent] and called Wells Fargo, who was our mortgage, because I know they paid the premium, and she had no record of us having insurance . . . .
>
> Q: And you didn't have insurance because?
>
> A: [Debbie Spallone] told me it lapsed.
>
> Q: . . . Did it actually lapse?
>
> A: No. . . . But . . . I think, it was due . . . [the insurance contract] terminated for that year before October 23rd and then the new one started October 24th, so . . . .
>
> . . .

8

> Q: So the confluence of events was that Sandy happens right at the same time . . . and that's when it lapsed? Was just about the same time? I'm just guessing.
>
> A: It was that week, probably, like a week before Sandy, it lapsed because you have to see the policy terms, you know, the effective date and the end date.
>
> Q: Yeah.
>
> A: I think it was like a week before Sandy.
>
> Q: Okay. So, but in the end, it turns out that your policy did not lapse?
>
> A: No.

(M. Andrews 8/31/15 Dep. p. 11-13)  This evidence is insufficient to support an inference of bad faith.

Summary judgment will be granted to Merchants as to the bad faith claim.[4]

## Conclusion

For the reasons stated above, and in keeping with the discussion held on the record during oral argument, Defendant's motion for summary judgment will be granted.  An Order will accompany this Opinion.


Dated: July 12, 2016                                       s/ Joseph H. Rodriguez
                                                                                   Joseph H. Rodriguez, USDJ

---

[4] In light of the disposition of the claims on the merits, Merchants' spoliation argument (Moving Brief p. 8-14) is moot.